T.C. Memo. 2014-179

UNITED STATES TAX COURT

LEON MAC CROSSWHITE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19878-11L.                          Filed September 2, 2014.

Vincent Mesis Jr., for petitioner.

G. Chad Barton, for respondent.

MEMORANDUM OPINION

PARIS, Judge: This case is before the Court on a petition for review of a

Notice of Determination Concerning Collection Action(s) Under Section 6320

and/or 6330 (notice of determination). See sec. 6330(d).[1] Petitioner seeks review

_____

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code of 1986, as amended, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

**[*2]** of respondent's determination to proceed with a proposed levy. This collection action concerns outstanding employment tax liabilities from Forms 941, Employer's Quarterly Federal Tax Return, that petitioner owes as a result of his ownership of the sole proprietorship Crosswhite Spraying Service, for the following quarterly periods: September 30 and December 31, 1998;[2] March 31, June 30, September 30, and December 31, 1999; March 31 and June 30, 2000; June 30 and September 30, 2002; June 30 and September 30, 2003; and December 31, 2004. The issue for decision is whether respondent's determination to sustain the proposed collection by levy constitutes an abuse of discretion.

## Background

The parties submitted this case for decision fully stipulated. See Rule 122(a). The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Oklahoma at the time he filed his petition.

A. Petitioner's Administrative Offers-in-Compromise

On October 31, 2003, petitioner's attorney, Vincent Mesis, Jr., mailed to respondent's Centralized Offer in Compromise (COIC) Unit in New York a Form 656, Offer in Compromise, on behalf of petitioner and his wife to settle certain of

---

[2]The Court notes that, after the date of the notice of determination, through a series of payments and transfers of overpayments the September 30, 1998, balance is now zero.

[*3] petitioner's outstanding Form 941 employment tax liabilities.[3] Respondent did not process the offer-in-compromise, and on November 20, 2003, respondent returned it to petitioner along with a letter indicating the offer was not processable because respondent's records showed that: (1) petitioner had failed to file Forms 941 for the quarterly periods ending on September 30, 1998; June 30, September 30, and December 31, 2002; (2) petitioner had failed to timely file and pay his quarterly Form 941 employment tax liabilities for the quarterly periods ending on June 30 and September 30, 2003; and (3) petitioner had failed to make timely Federal tax deposits during the quarterly period in which the offer-in-compromise was submitted.

On March 16, 2004, Mr. Mesis sent respondent a letter indicating that respondent's records were incorrect and that respondent had erred in returning the offer-in-compromise or alternatively that respondent had intentionally not processed petitioner's offer in order to require petitioner to submit an additional offer after the date in which an application fee was required.[4] Specifically, Mr.

---

[3]As discussed infra, petitioner's wife was not liable for the Form 941 employment tax liabilities that are at issue. The record does not show the terms of petitioner's proposed offer.

[4]Pursuant to the grant of authority in 31 U.S.C. sec. 9701, the Secretary issued final regulations, secs. 300.0 and 300.3, User Fee Regs., effective

(continued...)

[*4] Mesis indicated in his letter that petitioner had filed Forms 941 for the quarterly periods ending on September 30, 1998, and June 30, September 30, and December 31, 2002. He also indicated that he was enclosing copies of the Forms 941 for those quarterly periods as well as the June 30 and September 30, 2003, quarterly periods.[5] Mr. Mesis represented to respondent that petitioner had been advised by his accountant that it was not necessary for petitioner to make a monthly deposit for the quarter in which the offer-in-compromise was submitted. He enclosed a copy of a Form 656 and requested respondent to accept the offer and "submit it for review."[6]

Respondent did not process petitioner's second offer-in-compromise, and on March 24, 2004, respondent returned petitioner's Form 656, indicating by letter that the offer-in-compromise could not be processed because petitioner had failed to submit an application fee.

_____

[4](...continued)
November 1, 2003, generally requiring a taxpayer to submit a $150 application fee before IRS acceptance and processing of an offer-in-compromise unless the taxpayer meets the Low Income Certification guidelines. T.D. 9086, 2003-2 C.B. 817; see also Rev. Proc. 2003-71, sec. 2.03, 2003-2 C.B. 517, 517.

[5]The purported copies of the Forms 941 enclosed with the letter are not a part of the record.

[6]The record does not show the terms of petitioner's proposed offer.

[*5]    On April 7, 2004, Mr. Mesis sent respondent a letter indicating that when petitioner had filed the October 31, 2003, offer-in-compromise, no fee was required and that respondent had failed to process petitioner's original offer for no valid reason.  Mr. Mesis enclosed a Form 656 along with a $300 check for the application fee but asserted in his letter that respondent was attempting to "extort" this fee from petitioner.[7]  He requested that respondent process the offer and refund the $300.[8]

On July 12, 2004, respondent sent to petitioner a CP 504 notice, indicating respondent might levy upon State tax refunds petitioner might be entitled to because petitioner had failed to pay his Form 941 employment tax liability with

---

[7]It is not apparent from the record why Mr. Mesis submitted a $300 check when the application fee required at that time was $150.  The amount of petitioner's offer and the details surrounding petitioner's offer are not in the record, but periodic payment offers-in-compromise did not require submission of the first proposed payment until 60 days after May 17, 2006.  See sec. 7122(c) (2006); see also Tax Increase Prevention and Reconciliation Act of 2005 (TIPRA), Pub. L. No. 109-222, sec. 509(a), 120 Stat. at 362.  The record does not show the terms of petitioner's proposed offer.

[8]As indicated infra p. 6, respondent apparently did not process petitioner's April 7, 2004, offer-in-compromise.  Sec. 7122(f) (2006) provides that a taxpayer's submitted offer-in-compromise is deemed accepted by the Secretary after 24 months if the Secretary fails to reject that offer.  This provision is inapplicable to petitioner's April 7, 2004, offer-in-compromise because subsection (f) applies only to offers submitted on or after the date which is 60 days after May 17, 2006.  See TIPRA sec. 509(b)(2), 120 Stat. at 363.

**[*6]** respect to the quarterly period ending on September 30, 1998. On July 13, 2004, Mr. Mesis sent respondent a letter indicating that petitioner had filed an offer-in-compromise and that he believed respondent's assessment of the Form 941 taxes relating to petitioner's quarterly period ending on September 30, 1998, was in error. Mr. Mesis requested that respondent provide him supporting documentation for the assessment of this tax before any levy being made.

On August 30, 2004, respondent issued petitioner a Notice CP 171 for each unpaid balance for petitioner's Form 941 employment tax liabilities for the quarters ending December 31, 1998; March 31, June 30, September 30, and December 31, 1999; and March 31 and June 30, 2000. On September 21, 2004, petitioner's attorney mailed respondent a letter asserting that these taxes were the subject of an offer-in-compromise.

On December 31, 2006, Mr. Mesis mailed respondent a letter requesting that respondent advise him of the status of petitioner's offer-in-compromise so that the matter could be resolved.

On January 18, 2007, Mr. Mesis mailed to respondent a letter acknowledging receipt of a letter dated January 3, 2007, setting forth facts relating to the offer-in-compromise, and requesting that respondent proceed expeditiously

**[*7]** with sending a written acknowledgment of the offer-in-compromise and a written acceptance of the offer.

In the meantime, petitioner sent to respondent an additional Form 656.[9] Respondent did not process petitioner's offer-in-compromise, and on March 20, 2007, respondent returned the Form 656, indicating by letter that petitioner had failed to: (1) pay the $150 offer-in-compromise application fee; (2) make an initial payment with the offer; and (3) file all required Federal tax returns. On April 23, 2007, Mr. Mesis sent respondent a letter asserting that petitioner was not required to pay an application fee and that he had filed all required tax returns.

B. Collection Due Process Hearing

On June 22, 2009, respondent sent petitioner a Final Notice-Notice of Intent to Levy and Notice of Your Right to a Hearing (notice of levy) with respect to petitioner's Form 941 employment tax liabilities for the quarterly periods ending on September 30 and December 31, 1998; March 31, June 30, September 30, and December 31, 1999; March 31 and June 30, 2000; June 30 and September 30, 2002; June 30 and September 30, 2003; and December 31, 2004. On the date the

---

[9]The parties have stipulated that this offer-in-compromise was submitted "on an unknown later date". The record does not show the terms of petitioner's proposed offer.

**[\*8]** notice of levy was mailed, according to respondent's records petitioner owed $110,709 for the assessed balances, late penalties, and interest.

On July 9, 2009, Mr. Mesis mailed respondent a letter indicating that it was his belief that respondent had accepted one of petitioner's offers-in-compromise because petitioner had not received a response from respondent rejecting that offer.

On July 13, 2009, petitioner timely sent respondent a Form 12153, Request for a Collection Due Process or Equivalent Hearing, and indicated that the hearing request was in regard to the filing of a notice of Federal tax lien and a proposed or actual levy. Petitioner also indicated that he wanted to submit an offer-in-compromise as a collection alternative.

On September 30, 2009, respondent sent to petitioner a letter acknowledging receipt of petitioner's Form 12153. Respondent also indicated that petitioner was not entitled to a section 6320 hearing with respect to the Form 941 taxes.[10] The parties agree that respondent was correct in determining that petitioner cannot challenge the filing of a notice of Federal tax lien under section

---

[10]The record shows that respondent filed a notice of Federal tax lien on February 28, 2001, with respect to petitioner's Form 941 employment tax liabilities for quarterly periods ending on December 31, 1998; March 31, June 30, September 30, and December 31, 1999; and March 31 and June 30, 2000.

[*9] 6320 for certain Form 941 taxes and that the dispute properly before the Court relates to the notice of intent to levy.[11]

On February 23, 2010, Settlement Officer Jeffrey Silverhorn (SO Silverhorn) sent petitioner a letter acknowledging that the Internal Revenue Service Appeals Office had received petitioner's request for a section 6330 hearing. SO Silverhorn advised petitioner that before he could consider an offer-in-compromise, petitioner would need to file Forms 941 for quarterly periods ending on December 31, 2003, and March 31, 2004, as well as provide proof of estimated tax payments for December 2009. The letter also stated the following:

> Your primary argument is the IRS did not properly consider the OIC that was submitted to the Centralized Offer Unit on 10/31/2003. Based on the evidence reviewed, I believe the COIC unit did receive your request but it could not be considered primarily due to noncompliance. IRS cannot consider any collection alternatives until you are completely compliant with all filing and paying requirements. They would have returned the OIC if compliance was at issue.
>
> With respect to the $150.00 user fee, the Service began collecting this for all offers beginning 11/01/2003. You submitted the OIC on 10/31/2003 and provided copies of postal receipts. Unfortunately, the

---

[11]The record shows that on February 12, 2001, respondent sent petitioner a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (notice of tax lien). Although petitioner checked the box on his Form 12153 for an equivalent hearing, respondent's Appeals Office determined that the equivalent hearing request was untimely because it was not made within one year after the end of the five-business-day period following the filing of the notice of tax lien. See sec. 301.6320-1(i)(2) Q&A-I7, Proced. & Admin. Regs.

[*10] OIC was returned due to the compliance issue. In fact, the compliance issue is still a factor in your case as notated above.

If it is your intention to submit another OIC, it will be considered under the current rules and regulations. I will consider the same if you desire.

On March 31, 2010, a face-to-face hearing was held between SO Silverhorn and petitioner, petitioner's wife, and Mr. Mesis. During the hearing Mr. Mesis raised an issue with respect to respondent's rejection of petitioner's October 31, 2003, offer-in-compromise. SO Silverhorn told Mr. Mesis that he would not consider petitioner's October 31, 2003, offer-in-compromise but that he would consider a new offer if petitioner wished to submit one. Mr. Mesis requested an additional 30 days to submit an offer-in-compromise, and SO Silverhorn agreed to allow him 30 additional days to do so.

On April 29, 2010, respondent's field assistance personnel received a Form 656 from petitioner and his wife. On the Form 656 petitioner indicated the offer was for Form 941 employment tax liabilities for the quarters ending on December 31, 1998; March 31, June 30, September 30, and December 31, 1999; and March 31 and June 30, 2000. Petitioner also proposed to settle these taxes through a short-term periodic payment offer-in-compromise of $7,200 based on doubt as to collectibility and payable over 24 months. Attached to the Form 656 was an

[*11] "Explanation of Circumstances" that indicated that petitioner's business had been adversely affected in 2001 and 2002 by an ice storm and by an employee who stole and embezzled from petitioner's business.

On May 3, 2010, SO Silverhorn reviewed petitioner's offer-in-compromise and the next day sent it to respondent's COIC Unit. On May 25, 2010, respondent's COIC Unit mailed petitioner a letter indicating that petitioner would need to amend the April 29, 2010, offer-in-compromise before respondent could process it. Specifically, respondent advised petitioner that the offer had been made on behalf of petitioner and his wife but that his wife was not liable for the Form 941 employment tax liabilities; that the offer failed to list all the Form 941 employment tax liabilities petitioner owed; and that the offer was not accompanied by a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. By letter dated July 15, 2010, Mr. Mesis stated that he would provide an amended offer-in-compromise on or before August 15, 2010.

On September 8, 2010, respondent's COIC Unit received from petitioner an amended offer-in-compromise, a completed Form 433-A, and other documentation. This offer was made by petitioner only and not jointly with his wife and was made with respect to Form 941 employment tax liabilities for the quarters ending September 30 and December 31, 1998; March 31, June 30,

[*12] September 30, and December 31, 1999; March 31 and June 30, 2000; June 30 and September 30, 2002; June 30 and September 30, 2003; and December 31, 2004. Petitioner again proposed to settle these outstanding taxes through a short-term periodic payment offer-in-compromise of $7,200 based on doubt as to collectibility and payable over 24 months. Petitioner's assets according to petitioner's September 2010 Form 433-A are summarized as follows:[12]

| Assets | Equity |
|---|---|
| Liquid assets, bank accounts, IRA, and life insurance | $21,075 |
| Credit lines | 9,505 |
| Equity in business | 30,000 |
| Equity in home | 25,000 |
| Equity in vehicles | 26,100 |
| Equity in personal property | 15,072 |
| Accounts receivable (current) | 4,412 |
| Accounts receivable (over 30 days) | 1,262 |
| Accounts receivable (over 60 days) | 1,487 |
| Accounts receivable (over 90 days) | 10,281 |
| Business assets | 12,000 |
| Tools of trade | 5,000 |
| Total | 161,194 |

The Form 433-A also indicated that petitioner had $1,947 of total monthly income and $3,365 of total monthly living expenses. Petitioner also attached to his offer-

---

[12]The original Form 433-A had multiple subcategories. The classes and the amounts have been collapsed into primary categories and totaled to facilitate a table format.

**[\*13]** in-compromise a letter indicating that although petitioner's and his wife's health was "generally good", his wife had been diagnosed with breast cancer in 2005. He also indicated that when his wife was diagnosed with breast cancer their health insurance deductible was $10,000 and they had "a lot of out-of-pocket [health] expenses for several years."

On February 17, 2011, SO Silverhorn mailed to petitioner a letter informing him that he had determined on the basis of petitioner's Form 433-A that petitioner's reasonable collection potential was $82,948.[13] SO Silverhorn's calculations of petitioner's reasonable collection potential are summarized below.

---

[13]Generally, under the Commissioner's administrative guidelines, an offer to compromise based on doubt as to collectibility will be accepted only if the offer reflects the reasonable collection potential of the case. See Murphy v. Commissioner, 125 T.C. 301, 309 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); see also Internal Revenue Manual (IRM) pt. 5.8.1.1.3(3) (Sept. 1, 2005) ("Absent special circumstances, a Doubt as to Collectibility (DATC) offer amount must equal or exceed a taxpayers [sic] reasonable collection potential (RCP) in order to be considered for acceptance"). A taxpayer's reasonable collection potential includes realizable equity in assets owned by the taxpayer as well as amounts collectible from the taxpayer's future income after allowing for payment of necessary living expenses. IRM pt. 5.8.4.4.1 (Sept. 1, 2005).

**[*14]** <u>Quick sale value based on 80% of current market value</u>

| Assets | FMV | QSV | Encumb/Exemp | Equity |
|---|---|---|---|---|
| Liquid assets[1] | $21,073 | [2]$20,703 | --- | $20,703 |
| Lines of credit | 9,505 | --- | --- | 9,505 |
| Business real property | 80,000 | 66,000 | $51,000 | 15,000 |
| Home | 75,000 | 60,000 | 49,979 | 5,010 |
| Household goods | 15,000 | --- | 8,370 | 6,630 |
| Vehicles | 35,700 | --- | 9,683 | 26,100 |
| Accounts receivable | 44,461 | --- | --- | -0- |
| Total reasonable collection potential | | | | 82,948 |

[1]Liquid assets includes petitioner's bank accounts, IRA, and life insurance.
[2]Respondent determined that petitioner's IRA had a fair market value of $1,235 and a quick-sale value of $865.

SO Silverhorn also determined that petitioner had monthly net negative income of $2,073, consisting of $1,947 of gross monthly income and $4,020 of total monthly allowable expenses. In determining petitioner had $4,020 of total monthly allowable expenses, SO Silverhorn determined that petitioner was entitled to $655 more in monthly expenses than he had claimed on his Form 433-A.[14] Directly

[14]Specifically, SO Silverhorn determined that petitioner was entitled to a monthly national standard allowance of $985 for "Misc."; a monthly national standard allowance of $957 for "Housing and Utilities"; $478 for ownership costs related to petitioner's vehicles; $400 for out-of-pocket health care costs; and $1,200 for health insurance costs.

[*15] below SO Silverhorn's income and expense analysis was the notation

"Currently not collectible closing code: 28 ($52,000)".  The letter also stated the

following:

> As you can see, I will not be able to recommend the OIC based on doubt as to collectibility since you have the ability to pay more.  I have also factored in your spouse's medical situation by allowing the additional medical expenses as reflected above.
>
> After careful consideration of the other factors presented, I will be willing to recommend an OIC totaling $61,815 for acceptance.  I will of course consider any additional information such as additional expenses that may not have been previously considered.
> If you are willing to amend and increase the OIC to an acceptable amount, please respond by 02/28/2011 and I will submit you an amended 656.  You may also contact me at the telephone number listed above.

On February 25, 2011, Mr. Mesis mailed a letter to SO Silverhorn indicating

that petitioner would amend and increase his offer-in-compromise.  Mr. Mesis also

indicated in his letter that he was enclosing Forms 941 for quarterly periods

ending on December 31, 2003, and March 31, 2004.  On April 14, 2011, SO

Silverhorn mailed petitioner an Addendum to Form 656 through which petitioner

could amend his offer-in-compromise.

On April 29, 2011, Mr. Mesis mailed respondent a letter indicating that he

had "questions * * * concerning the basis for [SO Silverhorn's] calculation of the

amount which should be offered".  Specifically, Mr. Mesis's "main question"

[*16] related to why SO Silverhorn was "showing $45,000.00 as accounts receivable for the company when * * * the correct current amount to date is $5,337.50". Mr. Mesis also indicated that the petitioner had a negative balance in his bank account as of February 2011 and that petitioner had also borrowed $7,000 from a bank. Mr. Mesis expressed frustration "about the method in which * * * [respondent] had handled [petitioner's] account from the time that the original Offer was submitted in October of 2003." He requested SO Silverhorn to submit a blank Addendum to Form 656 to permit his client to submit an amended offer-in-compromise "in an amount that they can reasonably be expected to pay on a monthly basis".

On June 20, 2011, SO Silverhorn recorded in his case activities record the following:

> Based on all facts reviewed will not be able to recommend OIC as filed. TP owes about $112k and is offering to settle for $7,200. They are still squabbling over the prior OIC that was returned in 2003. During Appeals consideration, TP was advised a viable OIC can be considered. POA however continues to write letters alluding to the original OIC filing. Based on all facts/circumstances, Appeals cannot recommend the $7,200 offer but would be willing to recommend an amended OIC totaling $68,847.00 based on the RCP. Set [deadline of July 5, 2011] to respond. Do not expect TP & POA to agree but wanted to give one last opportunity. Sent revised letter along w/addendum reflecting the same.

[*17] Also on June 20, 2011, SO Silverhorn mailed petitioner a letter indicating that he had determined that his calculation for petitioner's reasonable collection potential "was not computed correctly and should be reduced". SO Silverhorn also determined, however, that certain business assets that were not included in the original calculation of petitioner's reasonable collection potential should now be included in that calculation. He provided in his letter two tables explaining his calculation of petitioner's reasonable collection potential, both of which are summarized below.

### Quick sale value based on 80% of current market value

| Assets | FMV | QSV | Encumb/Exemp | Equity |
|--------|-----|-----|--------------|--------|
| Liquid assets | $21,073 | [1]$20,703 | --- | [2]$9,075 |
| Lines of credit | 9,505 | --- | --- | --- |
| Business | 80,000 | 66,000 | $51,000 | 15,000 |
| Home | 75,000 | 60,000 | 49,979 | [3]5,010 |
| Household goods | 15,000 | --- | 8,370 | 6,630 |
| Vehicles | 35,700 | 28,560 | 9,683 | 18,870 |
| Accounts receivable | 44,461 | --- | --- | -0- |
| Total reasonable collection potential | | | | 54,585 |

[1]See supra p. 14 table note 1.
[2]Respondent determined that petitioner had zero equity with respect to his bank account, which had originally had a fair market value of $11,628 on the previous submission.

[*18] [3]It appears the settlement officer reduced the available equity in the home by 50% to reflect the potential spousal ownership interest in the tenancy. Petitioner was solely responsible for the trust fund recovery penalties.

Quick sale value based on 80% of current market value

| Assets | FMV | QSV | Encumb/Exemp | Equity |
|---|---|---|---|---|
| Account receivable | $5,337 | --- | --- | $5,337 |
| A/R--60 days | 1,261 | --- | --- | --- |
| A/R--90 plus days | 1,486 | --- | --- | --- |
| A/R over 90 days | 10,280 | --- | --- | --- |
| Business assets | 15,000 | $12,000 | $3,074 | 8,926 |
| Tools of trade | 5,000 | 4,000 | 4,185 | --- |
| Total reasonable collection potential | | | | [1]14,263 |

[1]The number in SO Silverhorn's letter to petitioner was entered erroneously as $14,630. However, SO Silverhorn arrived at the correct total net equity of $68,847 despite this miscalculation.

The letter also stated the following:

> As you can see, I eliminated the previous bank account balance to $0, reduced the vehicles to a quick sale value ($18,870), and utilized the accounts receivable currently due $5,337.00 and listed it as an asset since there is no future value of income (FVI) to consider.

> I have also factored in your spouse's medical situation by allowing the additional medical expenses as reflected above.

> Based on these facts, I will not be able to recommend the $7,200.00 OIC but would be willing to recommend an amended OIC totaling $68,847.00 based on the tables.

[*19] Based on the last letter received, it does not appear you will be able to fund the revised OIC. If you are however willing to amend and increase the OIC to an acceptable amount, please respond by 07/05/2011. Your POA can submit an amended 656. You may also contact me at the telephone number listed above.

On June 29, 2011, Mr. Mesis mailed SO Silverhorn a letter indicating that he had received the June 20, 2011, letter and that it was his intent to "amend and increase the OIC previously submitted". Mr. Mesis also indicated that he would submit the amended offer "within thirty days from the date of this letter". SO Silverhorn did not respond to petitioner's letter.

Thirty days after Mr. Mesis' correspondence, on July 29, 2011, respondent mailed petitioner the notice of determination sustaining the proposed levy. Respondent determined that petitioner's $7,200 offer-in-compromise should not be recommended for acceptance because petitioner could pay $68,847. Respondent also determined that although Mr. Mesis had indicated in his June 29, 2011, letter that he would submit an amended offer-in-compromise for the Appeals Office to consider, nothing had been received as of the date of the notice of determination. The same day that respondent mailed the notice of determination, July 29, 2011, Mr. Mesis hand-delivered Addendum to Form 656, accompanied by a letter, revising the offer to $25,000. SO Silverhorn did not

**[\*20]** consider the Addendum to Form 656 and the revised offer as the documents literally passed in the office.[15]

Discussion

A.  Section 6330 Hearing

Under section 6331, if a person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax by levy upon all property and rights to property belonging to such person.  A taxpayer may appeal the proposed levy to the Internal Revenue Service (IRS) under section 6330 by requesting an administrative hearing.  At the hearing, the taxpayer may raise any relevant issue relating to the unpaid tax or the proposed levy, including challenges to the appropriateness of the collection action and collection alternatives such as an offer-in-compromise.  Sec. 6330(c)(2)(A).  The underlying tax liability is properly at issue at a collection due process hearing only when the taxpayer has not received a notice of deficiency or has not otherwise had an opportunity to challenge the liability.  Sec. 6330(c)(2)(B).

---

[15]The proposed addendum is marked as Ex. 43-P, subject to a relevancy objection by respondent.  The Court denies respondent's objection and finds that the performance of actually delivering the amended offer-in-compromise, although on the final day and probably the final hour, is relevant to deciding whether respondent abused his discretion in sustaining the levy.

[*21] Following the hearing, the Appeals officer must determine whether the proposed levy may proceed. The Appeals officer is required to take into consideration: (1) verification that the requirements of applicable law and administrative procedure have been met; (2) relevant issues raised by the taxpayer; and (3) whether the proposed collection action "balances the need for the efficient collection of taxes with the legitimate concern of the * * * [taxpayer] that any collection action be no more intrusive than necessary." Sec. 6330(c)(3). If the hearing culminates in an adverse determination, the taxpayer may seek judicial review of the determination in the Tax Court pursuant to section 6330(d). Petitioner seeks review of respondent's determination.

B. Standard of Review

When the validity of the underlying tax liability is properly at issue, the Court will review the matter de novo. Davis v. Commissioner, 115 T.C. 35, 39 (2000). When the underlying tax liability is not properly at issue, the Court will review the Commissioner's administrative determination for abuse of discretion. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). In reviewing for abuse of discretion, we will reject the determination of the Appeals Office only if the determination was arbitrary,

[*22] capricious, or without sound basis in fact or law.  See Murphy v. Commissioner, 125 T.C. 301, 308, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).

C.  Tax Liability

On brief petitioner argues that although he does not contest the existence or amounts of Form 941 employment tax liabilities with respect to the quarters ending in 1998, 1999, and 2000, he does contest "all other quarters".  Judicial review of a notice of determination is limited to issues that the taxpayer properly raised at the CDP hearing.  Sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.; see Giamelli v. Commissioner, 129 T.C. 112, 112-116 (2007).  Petitioner did not raise the issue of underlying liability at his CDP hearing with SO Silverhorn.  Therefore, petitioner is precluded from contesting the underlying liabilities at this time.

Alternatively, petitioner did not adhere to the Court's Rules for raising an issue pertaining to a lien or levy in the petition.  Pursuant to the Court's Rules, a petition filed in a section 6330 case must contain "clear and concise assignments of each and every error which the petitioner alleges to have been committed in the notice of determination."  Rule 331(b)(4).  Any issue not raised in the assignments of error shall be deemed conceded.  Id.  Petitioner has failed to challenge the validity of the underlying tax liabilities in his petition.  Accordingly, we conclude

**[\*23]** that petitioner is precluded from challenging the validity of his underlying tax liabilities in this case.

D.  Petitioner's October 2003 Offer-in-Compromise

Petitioner argues that SO Silverhorn abused his discretion in failing to consider his October 2003 offer-in-compromise and that his offer should have been processed in 2003 without a $150 application fee.  Respondent argues that petitioner's offer-in-compromise was returned because at the time petitioner filed his offer respondent's records showed that:  petitioner had failed to file Forms 941 for the quarters ending on September 30, 1998, and June 30, September 30, and December 31, 2002; petitioner had failed to timely file and pay his quarterly Form 941 employment tax liabilities for the two quarters preceding the quarter the offer was submitted; and petitioner had failed to make timely Federal tax deposits during the quarter in which he submitted his offer.  See IRM pt. 5.8.3.2.1 (Nov. 30, 2001).

Section 7122(a) authorizes the Secretary to compromise any civil case arising under the internal revenue laws.  Section 7122(c) provides that the Secretary shall prescribe guidelines to be used to evaluate "whether an offer-in-compromise is adequate and should be accepted to resolve a dispute."  Section 301.7122-1(d)(1), Proced. & Admin. Regs., provides that an "offer to compromise

**[\*24]** a tax liability pursuant to section 7122 must be submitted according to the procedures, and in the form and manner, prescribed by the Secretary".

Pursuant to IRM pt. 5.8.3.2.1(a) (Nov. 30, 2001), an offer-in-compromise is not processable and should be returned to a taxpayer who owns a business if the taxpayer has failed to: (1) file all required tax returns; (2) timely file and timely deposit all employment taxes for the two quarters preceding the offer-in-compromise; and (3) timely pay all Federal tax deposits that are due in the quarter in which the offer-in-compromise was submitted. See Reed v. Commissioner, 141 T.C. 248, 256 (2013) (noting that taxpayers requesting offers-in-compromise must be in compliance with their filing requirements and be current in their tax payments before IRS acceptance of an offer-in-compromise for processing), supplemented by T.C. Memo. 2014-41; see also Orum v. Commissioner, 412 F.3d 819, 821 (7th Cir. 2005) (holding that the judiciary's role is to ensure the lawfulness of executive decisions, not to micromanage executive decisionmaking), aff'g 123 T.C. 1 (2004). Generally, the decision to accept or reject an offer is left to the discretion of the Secretary, see sec. 301.7122-1(c)(1), Proced. & Admin. Regs., and the Commissioner does not abuse his discretion by returning an offer-in-compromise on account of taxpayers' failure to meet current tax obligations, Reed v. Commissioner, 141 T.C. at 256 (and cases cited threat). Moreover, the

[*25] Commissioner is not required to reopen an offer-in-compromise during a section 6330 hearing when that offer has been returned to a taxpayer as not processable before the hearing. Id. at 254-255.

On October 31, 2003, petitioner submitted an offer-in-compromise, and on November 20, 2003, respondent returned that offer as not processable because respondent's records showed that petitioner was not in compliance with certain filing and tax payment requirements. Respondent's transcripts for petitioner's tax accounts show that petitioner filed his September 30, 1998, and June 30 and September 30, 2002, quarterly Forms 941 on March 22, 2004, which was several months after petitioner had submitted his offer-in-compromise. Additionally, respondent's records show that as of December 6, 2011, no payment had been received for petitioner's June 30, 2003, quarterly Form 941 tax period, which is one of the two quarters preceding the offer-in-compromise. SO Silverhorn's case activity record and February 23, 2010, letter to petitioner show that he reviewed petitioner's file and transcripts and determined that petitioner was not in compliance with his tax obligations when he submitted the offer-in-compromise. Although petitioner argues that he was in compliance with his tax obligations, the record is devoid of any evidence that would support his contention. Accordingly, we conclude that respondent did not abuse his discretion in determining that

[*26] petitioner was not in compliance with his tax obligations at the time his October 31, 2003, offer-in-compromise was submitted.

E.  Petitioner's September 2010 Offer-in-Compromise

Even though petitioner has submitted multiple offers-in-compromise beginning as early as 2003, the first complete offer to include the correct taxpayer, correct tax periods, supporting financial documentation, and filed tax returns was not delivered during the course of the CDP hearing until September 2010.  At that time petitioner proposed a short-term periodic payment offer-in-compromise based on doubt as to collectibility.  Pursuant to the relevant regulations, taxpayers may compromise their outstanding tax liabilities on three grounds:  (1) doubt as to liability; (2) doubt as to collectibility; and (3) promotion of effective tax administration.  Sec. 301.7122-1(b), Proced. & Admin. Regs.

The Secretary may compromise a liability on the ground of doubt as to collectibility when "the taxpayer's assets and income are less than the full amount of the liability."  Sec. 301.7122-1(b)(2), Proced. & Admin. Regs.  Determinations based on doubt as to collectibility will include a determination of a taxpayer's ability to pay, and the Secretary is required to "permit taxpayers to retain sufficient funds to pay basic living expenses."  Sec. 301.7122-1(c)(2)(i), Proced. & Admin. Regs.  An offer-in-compromise based on doubt as to collectibility "will be

[*27] considered acceptable if it is unlikely that the tax can be collected in full and the offer reasonably reflects the amount the Service could collect through other means * * * This amount is the reasonable collection potential of a case." Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. at 517. The policy of promoting effective tax administration means that the IRS has discretion to compromise liability when full collection could be achieved but would cause an economic hardship to the taxpayer and the compromise would not undermine compliance of the tax laws. See id.; see also sec. 301.6343-1(b)(4), Proced. & Admin. Regs. (defining economic hardship as the inability to pay reasonable basic living expenses).

The Internal Revenue Manual provides procedures for analyzing a taxpayer's financial condition to determine reasonable collection potential. See IRM pt. 5.8.5.1 (Sept. 23, 2008). A taxpayer's reasonable collection potential is defined under the IRM as net equity plus future income. Id. pt. 5.8.4.3 (June 1, 2010). "Future income is defined as an estimate of the taxpayer's ability to pay based on an analysis of gross income, less necessary living expenses, for a specific number of months into the future. The number of months depends on the payment terms of the offer." Id. pt. 5.8.5.23(2) (Oct. 22, 2010). "Generally, the amount to be collected from future income is calculated by taking the projected gross

[*28] monthly income, less allowable expenses, and multiplying the difference by the number of months applicable to the terms of the offer." Id. pt. 5.8.5.23(3) (Oct. 22, 2010).

SO Silverhorn rejected petitioner's $7,200 proposed offer-in-compromise but indicated in his June 20, 2011, letter that he "would be willing to recommend an amended OIC totaling $68,847.00 based on [petitioner's reasonable collection potential]." It appears that in determining petitioner's reasonable collection potential SO Silverhorn considered petitioner's net equity in personal and business assets but disregarded the fact that petitioner and his wife have a negative monthly net income of $2,073, which includes expenses SO Silverhorn himself determined were necessary. As discussed above, a taxpayer's reasonable collection potential includes both net equity and future income. See Porro v. Commissioner, T.C. Memo. 2014-81, at *8 (noting where an IRS settlement officer reduced taxpayers' reasonable collection potential because their monthly expenses exceeded their monthly income). It seems as if SO Silverhorn considered only one of these factors, net equity, in determining petitioner's reasonable collection potential and did not consider petitioner's future income in the calculation. In addition, the information in the Addendum to Form 656, dated July 29, 2011, was not considered in the determination of petitioner's reasonable collection potential. On

[*29] the record before us, we are unable to conclude whether it was an abuse of discretion for respondent to determine to proceed with the proposed levy for petitioner's Form 941 employment tax liabilities.  We will remand the case to respondent's Appeals Office for further consideration and clarification and to allow petitioner, if he wishes, to propose a new collection alternative.  See Fairlamb v. Commissioner, T.C. Memo. 2010-22; Blair v. Commissioner, T.C. Memo. 2009-232.  We also remand for clarification of why SO Silverhorn in his February 17, 2011, letter determined that petitioner's account should be placed in currently not collectible status but continued to seek an offer-in-compromise. See IRM pt. 5.16.1.1(2) (May 22, 2012).

To reflect the foregoing,

An appropriate order

will be issued.